UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ARTHREX, INC.,

       Plaintiff,

v.                     Case No: 2:11-cv-694-FtM-29CM

PARCUS MEDICAL, LLC,

       Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on Parcus Medical, LLC's Motion for Claim Construction (Doc. #195) and Arthrex, Inc.'s *Markman* Brief in Support of Claim Construction (Doc. #200), both filed on November 15, 2013. Arthrex filed a Response to Parcus' Motion for Claim Construction (Doc. #208) on December 2, 2013, and Parcus filed a Memorandum in Opposition to Arthrex's *Markman* Brief (Doc. #222) on December 6, 2013. The Court held a *Markman* hearing on July 21, 2014. Upon consideration of the parties' arguments, the Court construes the disputed terms as set forth below.

### I.   Background

Arthrex, Inc. (Arthrex) is a global medical device company engaged in the research, design, and sale of unique devices for the orthopedic surgical market. Arthrex was founded in the early 1980's, and is based in Naples, Florida. In 2007, several former high-level Arthrex executives formed Parcus Medical, LLC (Parcus)

to sell "generic" arthroscopic products with quality equal or superior to the products offered by the dominant companies in the industry, such as Arthrex, but at far lower prices.

Arthrex initiated this action against Parcus on December 15, 2011, and filed a six-count Amended Complaint on August 29, 2012, alleging infringement of U.S. Patent Nos. 5,993,451 (the '451 Patent) and 6,641,597 (the '597 Patent). (Doc. #81.) Parcus filed an Answer and Affirmative Defenses, as well as Amended Counterclaims alleging invalidity and non-infringement of the patents at issue (Counterclaims I-IV), and violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (FDUTPA) (Counterclaim V). (Doc. #87.) Arthrex responded to Parcus' counterclaims on September 21, 2012. (Doc. #98.)

## II.  Claim Construction Principles

The first step of the inquiries governing the infringement and validity of a patent requires a proper construction of the claims. See Cook Biotech, Inc. v. Acell, Inc., 460 F.3d 1365, 1372 (Fed. Cir. 2006); Medichem, S.A. v. Rolabo, S.L., 353 F.3d 928, 933 (Fed. Cir. 2003). "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." Lighting Ballast Control LLC v. Philips Electronics North America Corp., 744 F.3d 1272, 1284 (Fed. Cir. 2014) (en banc). The

district court determines "the metes and bounds of the claims that define the patent right . . . as set forth in the patent documents." Id. at 1285.

Claim construction is a matter of law. Shire Dev., LLC v. Watson Pharms., Inc., 746 F.3d 1326, 1330 (Fed. Cir. 2014). The proper construction of a patent's claims requires the court to look "to the words of the claims themselves, the specification, the prosecution history, and any relevant extrinsic evidence." Powell v. Home Depot U.S.A., Inc., 663 F.3d 1221, 1228 (Fed. Cir. 2011) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1315–17 (Fed. Cir. 2005) (en banc)). When construing a claim, a court must start with the language of the claim and remain focused on the words of the claim throughout. Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed Cir. 2012) (citing Phillips, 415 F.3d at 1313). Intrinsic evidence, such as the specification and prosecution history, may shed contextual light on the ordinary and customary meaning of a claim term. Shire Development, 746 F.3d at 1330; SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1195 (Fed. Cir. 2013). Among the intrinsic evidence, the written description is of particular

import, and it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on [it] for guidance as to the meaning of the claims." Phillips, 415 F.3d at 1317. This is so because the specification is the "single best guide to the meaning of a disputed term." Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"After considering this intrinsic evidence, a court may also seek guidance from extrinsic evidence such as expert testimony, dictionaries, and treatises." Suffolk Techs., LLC v. AOL Inc., 752 F.3d 1358, 1361 (Fed. Cir. 2014); Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1996) (en banc). While the extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (internal quotation marks and citation omitted).

Claim construction is not required to construe undisputed claim terms. Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1332 (Fed. Cir. 2009). The parties in this case now agree that the only claims for which construction is required are those set forth in this Opinion and Order.

### III. The Patents in Suit

**A.   The '451 Patent**

The '451 Patent, entitled "Cannulated Suture Anchor Drill Guide," was filed on January 14, 1999, and issued on November 30, 1999.   It claims priority from provisional application No. 60/023,088, which was filed on July 25, 1996.   The '451 Patent was issued to Dr. Stephen S. Burkhart and assigned to Arthrex.   ('451 Patent.)

The invention disclosed in the '451 Patent "provides a method and apparatus for inserting and installing suture anchors through a thin, cannulated drill guide."   ('451 Patent, 1:53-55.)   To install a suture anchor into bone, an obturator is used with the drill guide to penetrate the ligament.   Once the ligament has been penetrated, the obturator is removed and the V-shaped indentation of the drill guide is placed so that the indentation straddles the bone formation at the repair site.   A suture anchor and driver assembly are then inserted through a central cannula, which extends through the shaft and handle of the drill guide, and the driver assembly is used to attach the suture anchor to the bone.   An open section in the drill guide allows for visualization of the suture anchor during installation and a laser mark located on the side of the suture anchor driver serves as a depth stop.   ('451 Patent, 2:1-15.)   The drill guide of the '451 Patent was an advancement in the field of arthroscopic surgery because it allowed for the suture

anchor and the suture to be inserted through the ligament and bone
in one step, thereby eliminating the need for suture passers to
take the suture through the ligament as an additional step. ('451
Patent, 2:20-25.)

The two independent claims of the '451 Patent are claim 1 and
claim 7.  The pertinent portion of claim 1 states as follows, with
the disputed terms highlighted:

> **1.**  A surgical instrument for installing a suture anchor
> into bone **by turning** the suture anchor using a driver,
> the instrument comprising: a cannulated drill guide
> having a proximal end and a distal end; **a cylindrical
> handle** having a central cannula disposed on the proximal
> end of the drill guide, the cannulae of the drill guide
> and the handle having a common central axis; a **V-shaped
> indentation at the distal end of the drill guide for
> straddling a bone formation at a repair site**; and at
> least one window near the distal end of the drill guide
> and proximal to the V-shaped indentation for viewing the
> suture anchor and driver as they pass through the
> cannulated drill guide.
>
> . . .
>
> **7.**  The surgical instrument assembly for installing a
> suture anchor into bone **by turning** the suture anchor
> using a driver, the instrument comprising:  a cannulated
> drill guide having a proximal end and a distal end; a
> cylindrical handle having a central cannula disposed on
> the proximal end of the drill guide, the cannulae of the
> drill guide and the handle having a common central axis;
> a V-shaped indentation at the distal end of the drill
> guide for straddling a bone formation at a repair site;
> at least one window near the distal end of the drill
> guide for viewing the suture anchor and driver as they
> pass through the cannulated drill guide and proximal to
> the V-shaped indentation; and a suture anchor driver
> slidably disposed within the cannulated drill guide and
> having a proximal end and a distal end, the suture anchor
> driver being calibrated with the drill guide for

indicating a depth of insertion of the suture anchor installed into the bone.

('451 Patent, 4:33-48, 63-5:1-15.)   The disputed terms of the '451 Patent are construed as set forth below:

**(1)  "A surgical instrument [assembly] for installing a suture anchor into bone by turning the suture anchor using a driver"**

The initial phrase of the '451 Patent requiring construction is a portion of the preamble of claims 1 and 7.   Parcus asserts that the preamble, read in its entirety, is a claim limitation because the preamble states that the suture anchor and assembly are installed "by turning." (Doc. #195, p. 16.)   Arthrex asserts that the preamble is not a claim limitation because there was no reliance on this version of the preamble to distinguish the claimed invention from the prior art during the prosecution of the '451 Patent.  (Doc. #208, p. 16.)

"Whether to treat a preamble term as a claim limitation is 'determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'" American Med. Sys., Inc. v. Biolitec, Inc., 618 F.3d 1354, 1358 (Fed. Cir. 2010) (quoting Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 831 (Fed. Cir. 2003)).   "[A] claim preamble has the import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to

define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).

Generally, the preamble does not limit a claim. Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002). A preamble is not regarded as limiting "when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." Id. at 809. "Thus, in general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation." Symantec Corp. v. Computer Associates Int'l, Inc., 522 F.3d 1279, 1288-89 (Fed. Cir. 2008).

A preamble will be construed as limiting, however, "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." Catalina Mktg. Int'l, Inc., 289 F.3d at 808 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999)). Additionally, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms

the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." Id.   "When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. On the other hand, if the body of the claim sets out the complete invention, then the language of the preamble may be superfluous. Eaton Corp. v. Rockwell Intern. Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003) (internal citations and quotation marks omitted).

Parcus argues that prosecution history reveals that the "by turning" portion of the preamble is a claim limitation.   The Court disagrees.   On June 21, 1999, the patent examiner allowed claims 1 and 7 of the '451 Patent.   (Doc. #200-22, p. 2.)   At the time of allowance, the preamble of claim 1 was "A surgical instrument for drilling a suture anchor into bone using a driver," and the preamble to claim 7 was "A surgical instrument assembly for drilling a suture anchor into bone."   (Doc. #200-21, pp. 2-3.) The prosecution history reveals that Arthrex, following the issuance of the Notice of Allowance, requested to amend claims 1 and 7 to

> correctly recite an instrument for installing, rather than drilling, a suture anchor into bone, by turning the suture anchor.   The specification similarly has been amended to more accurately describe the invention.   The correction relates to the fact that threaded suture anchors such as those depicted in Figs. 8-9 which do not have flutes and do not "drill" into the bone.

(Doc. #200-19, p. 58.)  The prosecution history clearly establishes that the claims were accepted prior to the amendment; thus, the Court finds that the amendments to the preamble were not relied upon to distinguish the claimed invention from the prior art. Absent such reliance, a preamble is generally not limiting unless it is necessary to provide antecedent basis for the body of the claim.  See Catalina Mktg., 289 F.3d at 809.

Parcus argues that the preamble does provide antecedent basis for the claim and is therefore limiting.  The Court again disagrees.  If the phrase "by turning" was deleted from the preamble of claims 1 and 7, the claims would still describe a structurally complete cannulated suture anchor drill guide or assembly.  Because claims 1 and 7 disclose an "instrument" or an "assembly," the addition of "by turning" to the preamble does not add to the structure of the disclosed invention.  No other portion of the paten refers to installation "by turning," and the intrinsic evidence does not suggest that this is a limitation to the invention.  Furthermore, "a patent grants the right to exclude others from making, using, selling, offering to sale, or importing the claimed apparatus or composition for any use of that apparatus or composition, whether or not the patentee envisioned such use." Catalina Mktg., 289 F.3d at 809.  Accordingly, the Court finds

that the "by turning" portion of the preamble of claims 1 and 7 are not claim limitations.

### (2) "a cylindrical handle"

Arthrex asserts that "cylindrical handle" should be given its ordinary meaning, that is, "a handle that is shaped similar to a cylinder." (Doc. #208, p. 12.) Parcus challenges this interpretation, arguing that a better reading of the term is "[a] three-dimensional surface or solid object bounded by a curved surface and two parallel circles of equal size at the ends. The curved surface is formed by all the line segments joining corresponding points of the two parallel circles." (Doc. #195, p. 12.) In short, Parcus proposes that the handle be an exact geometric cylinder. Parcus argues that Arthrex has proffered a definition of "cylindrical" that "robs the term of all meaning or definiteness." (Doc. #195, p. 13.) Parcus further asserts that it would be a complete mystery as to "[h]ow 'cylinder-like' a shape must be to qualify as 'similar to a cylinder.'" (Id.)

"Cylindrical" is not a term with a defined meaning in the patent or in the field of art. The common dictionary definition of "cylindrical" is "relating to or having the form or properties of a cylinder." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/cylindrical (last visited July 22, 2014). See also Stedman's Medical Dictionary 445 (27th ed. 2000) (defining "cylindrical" as "[s]haped like a cylinder; referring to a

cylinder"). This ordinary definition is consistent with Arthrex's proposed construction.

The claims refer to a "cylindrical" handle, not a handle which is a geometric cylinder. If the Court were to accept Parcus' proposed construction, limitations that are not supported by the claim language or the specification would be read into the patent. Such a construction would also exclude a preferred embodiment of the cylindrical handle from the scope of the claim. (See '451 Patent, Fig. 4.) This "is rarely, if ever, correct." On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH, 386 F.3d 1133, 1139 (Fed. Cir. 2004) (quoting Globetrotter Software, Inc. v. Elan Computer Grp., Inc., 362 F.3d 1367, 1381 (Fed. Cir. 2004)).



FIG. 4

In Edwards Lifesciences AG v. CoreValve, Inc., 699 F.3d 1305, 1312 (Fed. Cir. 2012), the defendant argued that "cylindrical support" should be construed in accordance with the geometric definition of a cylinder. The Federal Circuit rejected this argument because the limitation that the support be a perfect cylinder was not found in the asserted patent's specification. Id. A similar argument was presented in Acumed LLC v. Stryker Corp., 483 F.3d 800, 804 (Fed. Cir. 2007). In Acumed, the district court construed the claim requirement of a "curved shank" as a shank that "has a bend or deviation from a straight line without sharp corners or sharp angles." Id. The defendant argued on

appeal that a better reading of the term is "a nonangular continuous bend." Id. The Federal Circuit upheld the district court's construction of "curved" because the use of a geometric construction, as opposed to the ordinary, lay meaning of the term, would create improper limitations. The defendant's argument that the district court's construction was insufficiently definite since "the court did not specify precisely how 'sharp' is too sharp" was also rejected because the resolution of the issue was properly left to the trier of fact. Id. at 806. See also Novatek, Inc. v. Sollami Co., 559 F. App'x 1011, 1020-21 (Fed. Cir. 2014) (requirement of "elongate cylindrical object" was proper construction).

The Court finds no evidence that the handle must be a geometric cylinder. Accordingly, the Court construes "cylindrical handle" as "a handle that is shaped similar to a cylinder."

**(3)   "a V-shaped indentation at the distal end of the drill guide for straddling a bone formation at a repair site"**

Parcus contends that the term "V-shaped indentation" is readily understandable and need not be construed by the Court, but if construction is required, Parcus asserts that it should be construed as "[a]n indentation in the shape of a 'V' or open fork." (Doc. #195, pp. 14-15.) Arthrex, on the other hand, proposes that the entire phrase be construed as "[a]n opening having a V-shape spanning a tip of the drill guide for straddling anatomical bone

at a repair site." (Doc. #208, p. 14.) Unlike Arthrex's proposed construction, which is limited to a single V-shaped indention, Parcus' proposed construction permits the inclusion of multiple indentations.

Parcus' proposed construction disregards both the claim language and the written description. Reading beyond "a V-shaped indentation" reveals that the indentation is used to straddle a bone formation at the repair site. ('451 Patent, 4:43-44.) The description of the preferred embodiment further provides that "the V-shaped tip **10** [shown in FIG. 1] is formed by a notch having an angle of preferably 50°. The V-shaped configuration of the guide tip sits precisely onto the rim of the glenoid for accurate, anatomical screw placement." ('451 Patent, 3:29-32.) Figures 6 and 6A, as shown below, illustrates how the indented tip straddles the bone formation.



FIG. 6



FIG. 6A

Arthrex's proposed construction is also supported by the prosecution history.  The prosecution history reveals that the limitation of a "V-shaped indentation" was added to the claim to distinguish the claimed invention from the prior art cited by the examiner, specifically, the Hearn Patent, U.S. Patent No. 5,755,721 (the '721 Patent), which disclosed a "U" shaped indentation spanning the tip of the drill guide (see Fig. 4 of the '721 Patent below).  (Doc. #200-19, pp. 46-58.)  Because the specification of the '451 Patent describes the V-shaped indentation as spanning the entire tip of the drill guide



FIG. 4

and the V-shaped tip was used to distinguish the indentation from the "U" shaped tip in the '721 Patent during prosecution, the Court agrees with Arthrex's proposed construction.  Accordingly, "a V-shaped indentation at the distal end of the drill guide for straddling a bone formation at a repair site" means "an opening having a V-shape spanning a tip of the drill guide for straddling anatomical bone at a repair site."

**B.   The '597 Patent**

The '597 Patent, titled "Interference Fit Knotless Suture Anchor Fixation," was filed on May 24, 2002, and issued on November 4, 2003.  It claims priority to provisional application Nos. 60/350,020, filed on January 23, 2002, and 60/293,170, filed on

May 25, 2001.  The '597 Patent was invented by Dr. Stephen S. Burkhart, R. Donald Grafton, and Peter J. Dreyfus, and assigned to Arthrex.  ('597 Patent.)

The '597 Patent discloses a device and method "for securing soft tissue to bone, and more particularly, to suture anchors for proximating tissue to bone using knotless interference fixation." ('597 Patent, 1:10-15.)  The suture anchor described by the '597 Patent has a ribbed or threaded body for retaining the anchor in a hole formed in the bone, a suture eyelet on the distal end of the anchor, and a drive head formed on the proximal end of the anchor body.  ('597 Patent, 1:50-52; 4:4-10.)  The method of reattaching tissue to bone using the suture anchor is comprised of the following steps: First, a length of suture is secured to the tissue.  The length of suture attached to the tissue is then threaded though the eyelet of the anchor, leaving lengths of suture extending from either side of the eyelet.  ('597 Patent, 4:26-30.) Finally, the suture anchor is installed in a preformed hole in the bone, whereby the lengths of suture are wedged between the suture anchor and the bone.  ('597 Patent, 1:60-67.)  By wedging the suture between the suture anchor and the bone, the method of the '597 Patent can be used to reattach tissue to bone without a surgeon having to tie a knot.  ('597 Patent, 1:10-15, 25-31, 60-67.)

The pertinent portion of claim 7 states as follows, with the disputed terms highlighted:

> **7.**  A method of reattaching tissue to bone using a suture anchor having **an eyelet formed on a distal end of the anchor** and a **drive head formed on a proximal end of the anchor**, the method comprising the steps of:  securing a length of suture to tissue; threading the length of suture through the eyelet on the distal end of the anchor, leaving lengths of suture extending from either side of the eyelet; and installing the suture anchor into the bone, whereby the lengths of suture are wedged between the suture anchor and the bone.

('597 Patent, 4:23-33.)  The disputed terms of the '597 patent are construed as set forth below:

### (1)  "an eyelet formed on a distal end of the anchor"

The dispute over the construction of this phrase is whether the claim language requires the eyelet to project out from the end of the anchor or just be located on the distal part of the anchor. Parcus' proposed construction is "[a] loop, hole or opening on, or protruding distally from, the distal tip of a suture anchor." (Doc. #195, p. 10.)   Arthrex argues that Parcus' proposed construction improperly imports limitations from the specification; therefore, the phrase should be construed as "[a] suture anchor having an eyelet through which suture can be passed located at a distal part of the anchor."  (Doc. #208, p. 9.)

The claim requires the suture anchor to have an eyelet "formed on a distal end." The phrase "formed on" suggests that the eyelet is constructed or placed on the distal end of the anchor and is

therefore distinct from an eyelet "on" the anchor.  This reading of "formed on" is supported by the claims describing the specific attributes of the suture anchor claimed in the '597 Patent.

The language in claim 1 is similar to the language in claim 7 in that the suture anchor has "an eyelet formed on the distal end of the body."  ('597 Patent, 4:11.)  Claim 4 discloses the suture anchor of claim 1 "wherein the eyelet is formed by a loop of suture."  ('597 Patent, 4:15-16.)  An eyelet formed by a loop suture (as shown below) signifies that the eyelet is formed on the distal tip of the anchor body, not on the body itself.  The specification also describes a "suture anchor having a suture eyelet provided on the distal end of the anchor."  ('597 Patent, 1:51-52.)



There can be a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims.  See Retractable Techs., Inc. v. Becton, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  "In reviewing the intrinsic record to construe the claims, [courts] strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."  Id.

18

In this case, the patent, when viewed in its entirety, reveals that the actual invention claimed has an eyelet formed on the distal tip of the suture anchor.  Therefore, the Court construes "an eyelet formed on a distal end of the anchor" as "a loop, hole or opening on, or protruding distally from, the distal tip of a suture anchor."

**(2)   "a drive head formed on a proximal end of the anchor"**

The parties agree that term "drive head" describes the part of the anchor that is engaged by the driver, but argue as to whether the "drive head" has to be distinct from the anchor body. Arthrex proposes that "drive head" be construed as "the part of the anchor that engages and compliments the suture anchor driver and that the drive head need not have any particular shape." (Doc. #200, p. 15.)  Parcus, on the other hand, asserts that "drive head" should be construed as "[a] head, i.e. a part that projects or extends from the proximal end of the anchor to be driven by an engaging driver, and not merely a surface or cavity in the end." (Doc. #195, p. 2.)

The claim does not state that the "drive head" is located at the proximal end of the anchor, as Arthrex's proposed construction suggests; rather, the plain language of the claim states that the head is "formed on" the anchor.  This language suggests that the head is distinct from the anchor body.  Such a reading is consistent with the references and illustrations in the

specification. Figures 1-3 (shown right) illustrate how the drive head (**10**) is distinct from the anchor body.



FIG. 1



FIG. 2



FIG. 3

Arthrex asserts that a prior art reference supports its proposed construction. The Court disagrees. In construing a claim, prior art can be helpful in determining how a disputed term is used by those skilled in the art. ArcelorMittal France v. AK Steel Corp., 700 F.3d 1314, 1321 (Fed. Cir. 2012) (citing Vitronics, 90 F.3d at 1584). The prior art refererence Arthrex refers to is the Dinsdale Patent, U.S. Patent No. 5,733,307 (the '307 Patent), which describes a "drive head" having a cavity or socket on the anchor body. (Doc. #208, p. 5.) Claim 1 of the Dinsdale Patent claims a "bone anchor body having a driver end" and claim 4 provides that "the bone anchor further comprises a drive pocket formed in said drive end." ('307 Patent, 5:39-40, 59-62.) Although the detailed description of Dinsdale refers to a "drive head" (**16**) having a countersunk pocket



FIG. 1

(**18**) (shown left), the patent does not claim a drive head. An anchor with a "driver end" is also redibly distinguisable from a "drive head formed

20

on a proximal end of the anchor" because a "driver end" connotes that it part of the anchor.

Another piece of extrinsic evidence supporting Parcus' proposed construction is the testimony of Arthrex's expert, Jorge Ochoa (Mr. Ochoa). Mr. Ochoa testified that a head is generally distinct from the body and projects outward. (Doc. #225-2.) Because the intrinsic and extrinsic evidence support Parcus' construction, the Court construes "drive head" as "a head, i.e. a part that projects or extends from the proximal end of the anchor to be driven by an engaging driver, and not merely a surface or cavity in the end."

Accordingly, it is now

**ORDERED:**

Parcus Medical, LLC's Motion for Claim Construction (Doc. #195) and Arthrex, Inc.'s *Markman* Brief in Support of Claim Construction (Doc. #200) are **GRANTED** as to the construction of the following terms:

1. The disputed terms of the '451 Patent are construed as follows:

    i. The "by turning" portion of the preamble of claims 1 and 7 are not claim limitations

    ii. A "cylindrical handle" means "a handle that is shaped similar to a cylinder."

    iii. A "V-shaped indentation at the distal end of the drill guide for straddling a bone formation at a repair site" means "an opening having a V-shape spanning a tip of the drill guide for straddling anatomical bone at a repair site."

2.  The disputed terms of the '597 Patent are construed as follows:

    i.  An "eyelet formed on a distal end of the anchor" means "a loop, hole or opening on, or protruding distally from, the distal tip of a suture anchor."

    ii. A "drive head formed on a proximal end of the anchor" means "a head, i.e. a part that projects or extends from the proximal end of the anchor to be driven by an engaging driver, and not merely a surface or cavity in the end."

**DONE AND ORDERED** at Fort Myers, Florida, this __29th__ day of July, 2014.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of record